**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **MELVIN A. MORRISS III**, an individual, | ) | Case No. 8:13-cv-00024 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **BRIEF IN OPPOSITION TO** |
| | ) | **DEFENDANT'S MOTION FOR** |
| **BNSF RAILWAY COMPANY**, a Delaware | ) | **SUMMARY JUDGMENT** |
| limited liability corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

Plaintiff, Melvin A. Morriss, III ("Melvin" or "Plaintiff"), by and through his undersigned attorneys, respectfully submits this Brief in Opposition to Defendant BNSF Railway Company's ("BNSF" or "Defendant") Motion for Summary Judgment.

## STATEMENT OF DISPUTED MATERIAL FACTS

1. Defendant's Statement of Undisputed Material Facts ("DSUMF") #2 is disputed. Defendant has an inherently discriminatory policy of refusing to hire certain individuals who have a BMI of 40 or above and who are merely at risk for developing future health conditions. (Doc #101-2, Melvin Dep. 52:25-54:7, Exhibit 11; Doc #101-4, Clark Dep. 42:17-43:6).

2. DSUMF #19 is disputed on the basis that Defendant takes Plaintiff's response to Interrogatory No. 8 out of context, as Plaintiff responded "See Interrogatory No. 5" where Melvin described the disabilities that he suffered from. (Doc #98-2, Melvin Dep. Exhibit 1.)

3. DSUMF #25 & #26 are disputed on the basis that such factual allegations give the impression that Melvin was a "direct threat" if employed in a safety sensitive position in light of the health risks often associated with Class III Obesity. First, Defendant discredits Dr. Pees' background with respect to his overall knowledge regarding obesity and/or Dr. Pees' experience with respect to the railroad work environment. (See DSUMF #22). Moreover, Dr. Pees did not testify as to the likelihood or imminence that Plaintiff would actually encounter any of the health risks and/or whether if Plaintiff were in fact to develop any of the health risks, the likelihood these health risks would impede his ability to serve as a diesel mechanic in any respect. Dr. Pees testified that despite Plaintiff's obesity, he was at less of a risk from suffering the negative effects associated with such health conditions like diabetes and hypertension than a person who has in fact been diagnosed and treated for having said conditions. (Doc # 101-6, Pees Dep. 69:7-71:6).

4. DSUMF #27 is disputed. Defendant states that, "In any event, BNSF declined to hire Morriss only because of his BMI." Defendant is cherry picking the testimony of its own witnesses. While Defendant's protocol was to medically disqualify candidates for employment, such as Melvin, due to his having a BMI of 40 or above, Defendant's rationale to medically disqualify Plaintiff linked said decision to secondary diseases most often statistically anticipated with Class III Obesity, including: diabetes, sleep apnea, cardiovascular disease, excessive daytime sleepiness, and joint disorders. (Doc #101-2, Melvin Dep. 52:25-54:7, Exhibit 11; Doc #101-4, Clark Dep. 42:17-43:6; 94:3-20; Doc #101-5, Kowalkowski Dep. 23:11-25; Doc #101-7, Jarrard Dep. 31:11-33:7).

5. DSUMF #37 is disputed to the degree that it implies that Jarrard's statement is anything more than unfounded and unsupported speculation with respect to the degree that people

with a BMI of 40 or above are a safety risk when working in safety sensitive positions. Melvin disputes Jarrard's opinion testimony herein and in Plaintiff's Brief in Support of Excluding Expert Testimony (Doc #105).

6.  DSUMF #39 is disputed to the degree that the statement implies that Dr. Jarrard has any foundation for his opinions concerning how certain health risks necessarily lead to sudden incapacitation. Melvin disputes Jarrard's opinion testimony herein and in Plaintiff's Brief in Support of Excluding Expert Testimony (Doc #105).

7.  DSUMF #40 is disputed to the degree that Defendant claims "The medical literature shows that individuals with Class III Obesity are more likely than not to develop one or more of the medical conditions that puts them at increased risk for sudden incapacitation and/or loss of consciousness, i.e. stroke, heart attack, etc." The medical literature cited by Jarrard addresses many of the secondary diseases (sleep apena, diabetes, hypertension) that can be associated with obesity, but is silent on any of the negative consequences related to said diseases or risk for sudden incapacitation and loss of consciousness resulting from said diseases. Other than Jarrard's baseless assertions, there is no evidence linking any of the secondary diseases with risk of sudden incapacitation or loss of consciousness. (Doc #101-8, 9 and 10, Jarrard Dep. Exhibit 3 and 4).

## SUPPLEMENTAL STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  Any individual with a Body Mass Index of 30 or above is considered to be obese. A BMI of 30 to 34.9 is Class I Obesity. A BMI of 35 to 39.9 is Class II Obesity. A BMI of 40 or above is Class III Obesity. (Doc #101-7, Jararrd Dep. Exhibit 2).

2.  Plaintiff weighed between 280lbs and 300lbs since 2009, and that on the day of his deposition, October 11, 2013, he weighed 285lbs. (Doc #101-2, Melvin Dep. 9:1-10:14).

3. Medical records from Dr. Pees' office on July 12, 2012, documented Plaintiff's weight as 289.7 (BMI: 41.72). (Office Note, Internal Medicine Group, July 12, 2012).

4. Prior to implementation of its qualification standard related to BMI in 2002, Defendant had no statistical data on how many individuals it employed with BMIs over 40 and no statistical data was used to influence the implementation of its policy. (Doc #101-8, Jarrard Dep. 23:18-25:20, 37:13-38-4).

5. In 2002, Defendant implemented its qualification standard related to BMI in response to medical literature from the National Heart Lung Institutes showing the increased likelihood of obese people developing future diseases compared to the non-obese population. Not because of any specific safety issues that were occurring prior to 2002. (Id.; Doc #101-7, Jarrard Dep. 34:20-35:2).

6. Jarrard asserts that he relied primarily on are the October 2000 National Institutes of Health's Practical Guide Identification, Evaluation, and Treatment of Overweight and Obesity in Adults ("2000 Practical Guide") and the October 1998 National Institutes of Health's Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults ("1998 Clinical Guidelines") in arriving at his opinion that the "probability that people with class three obesity will develop one of these medical conditions [heart disease, diabetes, sleep apnea, etc.] is so high it's unacceptable to us to accept that level of risk in these safety sensitive jobs. However the studies only discuss the "relative risk" that someone who is obese will develop a future disease and do not discuss the "actual risk" that a person will develop a future disease. Moreover, the studies do not discuss in any matter sudden incapacitation or other negative consequences

flowing from said diseases.  (Doc #101-8,  Jarrard Dep. 36:8-37:7, Ex. 3, Ex. 4 pp. 175, 177; Doc #101-9, Jarrard Depo. Ex. 4 p. 49).

7. The 2000 Practical Guide and the 1998 Clinical Guideline state that obesity is a disease. (Doc #101-8, Jarrard Dep. pp. 73 and 169).

8. Jarrard attempts to support Defendant's position that Melvin is a direct threat  by arguing: (1) that Melvin's co-morbidity risks differentiate him from someone who has a known condition, but where said condition is controlled, and (2) that a person who does not have a condition is more of a risk because said individual is likely to first learn of having developed a secondary disease only after experiencing a sudden incapacitating event while on the job.  (Doc #101-7, Jarrard Dep. 61:19-63:1, 80:11-81:8).

9. Dr. Pees testified that Melvin, despite being obese, was at less of a risk from suffering negative conditions associated with such diseases like diabetes and hypertension than a non-obese individual who has such condition(s), even if their condition(s) is controlled. (Doc #101-6, Dr. Pees Dep. 69:7-71:6).

10. Under certain circumstances, Defendant allows internal candidates to transfer from non-safety sensitive to safety-sensitive jobs, even when said candidates have a BMI of 40 or above. (Doc #101-7, Jarrard Dep. 52:24-53:50, 56:4-58:22).

11. Jarrard has no information as to the number of candidates who have been excluded from safety-sensitive jobs solely because said individuals had a BMI of 40 or above. (Doc #101-8, Jarrard Dep. 25:21-26:16).

12. Jarrard has no information as to the number of employees with BMIs of 40 or above who have transferred into safety-sensitive jobs from non-safety sensitive jobs since 2002. (Doc #101-8, Jarrard Dep. 29:22-30:2).

13. Jarrard has no information as to whether any employee who transferred into a safety-sensitive job from non-safety sensitive job, while having a BMI of 40 or above, has suffered an incapacitating event while on the job.  (Doc #101-8, Jarrard Dep. 30:12-25).

14. A candidate for employment in a safety sensitive job, who has a BMI of 39 and falls within the Class II Obese category, may be medically qualified by Defendant pursuant to an individualized assessment of said candidate.  (Doc #101-7, Jarrard Dep. 27:18-28:19).

15. Defendant cannot distinguish the likelihood that a Class III Obese employee  will suffer an incapacitating event while on the job compared to a employee who is Class II Obese. (Doc #101-7, Jarrard Dep. 65:12-66:12).

16. Defendant is unable to determine the likelihood of a person with a BMI of 39, an individual with Class II Obesity, will develop future diseases as compared to an employee like Melvin with a BMI of 40.7. (Doc #101-7, Jarrard Dep. 39:23-42:16).

## LEGAL ARGUMENT

Both parties agree that there are no genuine issues of material fact or law and that summary judgment is appropriate.  Of course, the parties diverge with respect to how judgment should be awarded.  However, the law is clear that Defendant's Motion for Summary Judgment ("Defendant's Motion") must fail as a matter of law as Defendant's treatment toward Melvin was a direct and clear violation of the Americans with Disabilities Act of 1990, 42 U.S.C.S. §§ 12101 et seq. (the "ADA"), as amended by ADA Amendments Act of 2008, Pub. L. No. 110-325, § 4 (the "ADAAA"), and the  Nebraska Fair Employment Practices Act, Neb. Rev. Stat. §§ 48-1101 et seq. (the "NFEPA").

**I.   MELVIN'S CLAIMS ARE COVERED UNDER THE ADA.**

With respect to the scope and purpose of the ADA, such was thoroughly discussed in Plaintiff's Brief in Support of Partial Summary Judgment (Doc #100).   To summarize that discussion, the ADA was passed, in part, to preclude employers from discriminating against employees or potential employees who may be more theoretically susceptible to developing impairments which may arise in the future.   Even before passage of the ADAAA, many courts recognized this basic principal of the ADA.

> Under the ADA, employers may not deny a person an employment opportunity based on paternalistic concerns regarding the person's health. For example, an employer could not use as an excuse for not hiring a person with HIV disease the claim that the employer was simply "protecting the individual" from opportunistic diseases to which the individual might be exposed. That is a concern that should rightfully be dealt with by the individual, in consultation with his or her private physician.

*Kalskett v. Larson Mfg. Co. of Iowa, Inc*., 146 F. Supp. 2d 961, 985 (N.D. Iowa 2001) (referencing the legislative history of the ADA) (citations omitted).   Another court recently stated:

> An individual rejected from a job because of the "myths, fears and stereotypes" associated with disabilities would be covered under this part of the definition of disability, whether or not the employer's or other covered entity's perception were shared by others in the field and whether or not the individual's actual physical or mental condition would be considered a disability under the first or second part of this definition. As the legislative history notes, sociologists have identified common attitudinal barriers that frequently result in employers excluding individuals with disabilities. These include concerns regarding productivity, safety, insurance, liability, attendance, cost of accommodation and accessibility, workers' compensation costs, and acceptance by coworkers and customers.

> Therefore, if an individual can show that an employer or other covered entity made an employment decision because of a perception of disability based on "myth, fear or stereotype," the individual will satisfy the "regarded as" part of the definition of disability. If the employer cannot articulate a non-discriminatory reason for the employment action, an inference that the employer is acting on the basis of "myth, fear or stereotype" can be drawn.

*Lizotte v. Dacotah Bank*, 2010 U.S. Dist. LEXIS 1223, 15-16 (D.N.D. 2010) (quoting 29 C.F.R.

pt. 1630 app.).

### A. Defendant Regarded Melvin as Having an Impairment Because It Feared Melvin Would Develop Future Health Conditions.

The crux of this matter is whether Defendant regarded Melvin as disabled and thus

violated the ADA, the ADAAA and the NFEPA by taking an adverse employment action against

him.  On this basis, there is no doubt that Defendant regarded Melvin as being impaired.  Thus,

not only is Defendant precluded as a matter of law from prevailing on its Motion for Summary

Judgment, but there remain no genuine issues of material fact or law to prevent Melvin from

being granted judgment in his favor on his Motion for Partial Summary Judgment. (Doc #99).

Courts have found that it is an extremely low threshold for an employee to have been regarded as

being impaired.

> An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3); see also 29 C.F.R. § 1630.2 (same); *Harty v. City of Sanford*, 2012 U.S. Dist. LEXIS 111121, 2012 WL 3243282, at *5 (M.D. Fla. 2012); *Mayorga v. Alorica, Inc.*, No. 12- 21578-CIV, 2012 U.S. Dist. LEXIS 103766, 2012 WL 3043021, at *8 (S.D. Fla. July 25, 2012). **The relevant inquiry in such cases is not the plaintiff's actual condition, but how the Defendant "perceived [his] condition, including the reactions and perceptions of the persons interacting with or working with him**." *Mayorga*, 2012 U.S. Dist. LEXIS 103766, 2012 WL 3043021, at *8 (citation omitted).

> The appendix to the rules explains: **To illustrate how straightforward application of the "regarded as" prong is, if an employer refused to hire an applicant because of skin graft scars, the employer has regarded the applicant as an individual with a disability.** Similarly, if an employer terminates an employee because he has cancer, the employer has regarded the employee as an individual with a disability.29 C.F.R. § 1630, App.n3 Moreover, the "regarded as" analysis is separate from whether the employer can eventually establish a defense to the action: Thus, for example, an employer who terminates an employee with angina from a manufacturing job that requires the employee to work around machinery, believing that the employee will pose a safety risk to

> himself or others if he were suddenly to lose consciousness, has regarded the individual as disabled. Whether the employer has a defense (e.g., that the employee posed a direct threat to himself or coworkers) is a separate inquiry. *Id.*

*EEOC v. Am. Tool & Mold, Inc*., 2014 U.S. Dist. LEXIS 71472, 16-18 (M.D. Fla. Apr. 16, 2014) (emphasis added).   "The definition of 'regarded as' disabled or impaired assumes the individual is not actually disabled for ADA purposes." *Lizotte*, 2010 U.S. Dist. LEXIS 1223 at *16 (citations omitted).  Thus, the focus is not on whether the employee is actually disabled, but rather the intent of the employer.  *Id*.   "'It is important to note that the employer's motive or intent is rarely susceptible to resolution at the summary judgment stage.'" *Id*. (citations omitted).

Defendant argues that it is entitled to summary judgment with respect to Plaintiff's "regarded as" claim for the reason that there is no evidence that Plaintiff's obesity is tied to a physiological condition or that Defendant perceived Melvin's obesity to be a physiological condition.  Defendant wishes to convince the Court that it based its decision to medically disqualify Melvin solely on a physical trait – i.e. Melvin's weight.  Yet, in the same breath it consistently maintains that it based its decision in light of certain "health risks" associated with Class III Obesity.   Not only does Defendant misconstrue the law, it completely misconstrues Melvin's claims of discrimination and ignores the actual testimony of its own witnesses.

It is abundantly clear that Defendant regarded Melvin as being impaired on the basis that he was at risk for developing numerous other health conditions.  As stated throughout, this is the very type of conduct that the ADA was designed to eliminate.  In fact, Defendant spends a great deal of its Summary Judgment Brief attempting to explain why those very same conditions present a direct threat to Plaintiff and the company.  To put it another way, Defendant medically disqualified Melvin because he had a condition which Defendant feared would develop into

diabetes, sleep apnea, cardiac disease, etc.  And in this instance, there is no genuine issue of fact regarding Defendant's intent.

Dr. Sharon Clark was the medical officer responsible for disqualifying Melvin after he received the conditional offer of employment.  Clark was unequivocal with respect to the basis for her decision. Clark testified:

> Q.  And you had no evidence to the contrary, that he actually had sleep apnea, is that right?
>
> A.  That's correct.
>
> Q.  And you didn't have any evidence that he had had coronary heart disease or heart disease?
>
> A.  That's correct.
>
> Q.  And you didn't have any information that he actually had diabetes?
>
> A.  That's correct.

(Doc #101-4, Clark Dep. 90:4-12).

***

> Q.  So the basis for Mr. Morriss's disqualification based on the Burlington Northern's protocol and his BMI was that he could eventually or could develop these health risks, not that he had those health risks?
>
> A.  **Yes**.

(Doc #101-4, Clark Dep. 91:21-92:1) (emphasis added).

Moreover, the intent of the Defendant was affirmed by Jarrard, Defendant's Chief Medical Officer and expert witness who testified as follows:

> Q.     Okay.  You already – I think you talked about it to some degree, but why do the - - these health conditions preclude you from medical – medically qualifying someone with a BMI of 40?
>
> A.     Okay.  Well, they're – again, the preclusion is a temporary preclusion because this is a condition that can change over time.  Clearly we know that.  But it's because the risk has gotten to the point – when – Again, all these conditions, to be clear, are prevalent in the full population.  These – Heart disease happens in BMIs 25 to whatever, so does diabetes, so does sleep apnea.  The difference is once you get above a BMI of 30, which is the first classification for obesity class

-10-

one, the risk starts to go up very fast. Class two is much higher risk than class one. Class three much, much higher.  And to use the words in that '98 or 2000 NHLBI, they talk about risk and extreme risk, once you get to class three obesity, extremely risky.  So it's the – the – not the conditions themselves, as much as the probability of risk.  That's what risk is it's a measure of – its another word for probability.  **The probability that people with class three obesity will develop one of these medical conditions is so high it's unacceptable to us to accept that level of risk in these safety sensitive jobs**.

(SSOF ¶6).

The only studies Jarrard references throughout his depositions are the October 2000 National Institutes of Health's Practical Guide Identification, Evaluation, and Treatment of Overweight and Obesity in Adults ("2000 Practical Guide") and the October 1998 National Institutes of Health's Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults ("1998 Clinical Guidelines").  (SSOF ¶6).  Those studies, in part, simply discuss how the disease of obesity place individuals, like Melvin, as a population group, at greater risk for developing other diseases. (SSOF ¶6).  Consequently, Jarrard's reliance on said studies only support Melvin's position that he was denied employment because Defendant feared he would develop future impairments as opposed to being denied employment solely because of his obesity.  As such, Melvin's obesity is analogous to having a genetic condition which at some time *could* develop into a future disability or being HIV positive which at some point in time *could* develop into AIDS.

Having a condition which may develop into a future disability is not a legal basis for denying someone employment.  In fact, it is why the ADA protects employees whom are regarded as being impaired from being discriminated against.  The current Interpretive Guidance on Title I of the Americans With Disabilities Act states:

The determination of whether an individual with a disability is qualified is to be made at the time of the employment decision. This determination should be based on the capabilities of the individual with a disability at the time of the

-11-

> employment decision, and should not be based on speculation that the employee may become unable in the future or may cause increased health insurance premiums or workers compensation costs.

29 CFR PART 1630 APPENDIX. See also *School Board of Nassau County, Florida, v. Arline*, 480 U.S. 273, 279, 107 S. Ct. 1123, 1126-27 (1987) ("expand[ing] the definition of 'handicapped individual' so as to preclude discrimination against '[a] person who . . . is regarded as having, an impairment [but who] may at present have no actual incapacity at all.'").

Defendant medically disqualified Melvin from the Diesel Mechanic position because Defendant considered him to be more theoretically susceptible to developing future impairments than non-obese individuals.  However, each and every one of these future impairments are clearly protected under the ADA and Defendant's conduct in this regard was a direct violation of the ADA, ADAAA and NFEPA.  For these reasons, the Defendant's Motion for Summary Judgment must fail as a matter of law.

### B.  Defendant Regarded Melvin's Obesity as a Health Concern as Opposed to a Disfavored Physical Trait.

Defendant attempts to cloak its discriminatory actions by arguing that not only did it base its decision solely due to Melvin's obesity, but that there is no evidence that Defendant regarded Melvin's obesity as being tied to a physiological condition.  Again, the Defendant misconstrues the law as well as the facts in this regard.  The entire purpose of the ADAAA was to shift the focus from whether an employee was actually disabled to whether the employer fulfilled its obligations under the law.

> In enacting the ADAAA, Congress rejected the narrow interpretation of disability adopted by the Supreme Court in *Toyoto Motor*, specifically, the Supreme Court's standard regarding "substantially limits," finding that this standard "has created an inappropriately high level of limitation necessary to obtain  coverage under the ADA," and directed the EEOC to revise that portion of its regulations which defines "substantially limits" as "significantly restricted" to be consistent with the ADAAA. ADA Amendments Act of 2008, Pub. L. No. 110-325, §2(b)(5) & (6),

122 Stat. 3553, 3554**. Congress further declared that the purpose of the ADAAA is to convey its intent "that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis[.]"** *Id*. at §2(b)(5), 122 Stat. at 3554.

*Gaus v. Norfolk S. Ry. Co*., 2011 U.S. Dist. LEXIS 111089, 50-51 (W.D. Pa. Sept. 28, 2011) (emphasis added).

In support of its argument that Melvin must demonstrate that his obesity was subjectively viewed by Defendant as being tied to an underlying physiological condition, Defendant relies on two post-ADAAA cases, namely, *Powell v. Gentiva Health Servs.*, 2014 U.S. Dist. LEXIS 17709 (S.D. Ala. Feb. 12, 2014) and *Sibilla v. Follett Corp*., 2012 U.S. Dist. LEXIS 46255 (E.D.N.Y. Mar. 30, 2012). Both of these cases are patently distinguishable from this action and neither case fully establishes the point in which a defendant is deemed to have regarded an employee's obesity as being tied to a physiological condition. To the degree that such evidence is still necessary, *Powell* suggests that a plaintiff's burden is minimal.

In *Powell,* a plaintiff claimed that she was terminated from her position based on her obesity. 2012 U.S. Dist. Lexis at **1-2. The *Powell* plaintiff did not appear to be obese, did not offer any physical limitations with respect to her obesity, and she denied experiencing any health conditions relating to her obesity. *Id*. at **19-20. In addition, the plaintiff failed to even plead that she was regarded as being disabled. Furthermore, and most damaging to her case, the employer offered evidence of the employee's poor performance, while the plaintiff could not provide any evidence that the employee's weight had any impact on its decision to terminate her and/or that employer perceived that her weight affected her ability to do her job in any capacity. *Id*. at *31-32. As such, the only complaints articulated by the plaintiff was that she was fired and she was obese. But without having any evidence that her weight had anything to do with the

-13-

employer's perception that she could not perform her job, the court concluded that decisions based solely on physical characteristics should not give rise to a regarded as impaired claim. The *Powell* court stated:

> Plaintiff's argument improperly equates a physical characteristic (*i.e.*, overweight status) with an impairment. However, plenty of people with an "undesirable" physical characteristic are not impaired in any sense of the word. To illustrate the point, suppose plaintiff wore her hair in a neon green mohawk. Such an unconventional hairstyle choice might be viewed as unprofessional, and might well impede her efforts to sell hospice services to physicians and senior living facilities, but it obviously is not a physical impairment. The same goes for weight. An overweight sales representative may have difficulty making sales if the prospective customer perceives her appearance to be unprofessional, but that does not render her weight a "physical or mental impairment" within any rational definition of the phrase. At most, plaintiff's evidence is that Merrell perceived that Gentiva customers were less likely to purchase hospice services from an overweight sales representative (just as they would be less likely to purchase such services from a sales representative sporting a green mohawk). Neither the hairstyle nor the weight is an actual or perceived impairment in that scenario. Yet that is all plaintiff offers on summary judgment.

*Id.* at **29-30.

Similarly, in *Sibilla v. Follett Corp.*, 2012 U.S. Dist. LEXIS 46255 (E.D.N.Y. Mar. 30, 2012) two overweight bookstore employees were not retained in their positions after the defendant employer purchased the bookstore. Neither employee was able to point to any objective evidence that the employer's decision not to retain them had anything to do with their weight and that the employer regarded them as impaired in any capacity. *Id.* at **20-25. In reaching this conclusion, the court emphasized that the ADAAA does not protect employees on the "basis of a simple physical characteristic such as weight." *Id.* at *25.

However, unlike *Powell* and *Sibilia*, where none of the plaintiffs could establish evidence linking their weight to the adverse employment decisions, this is a case of direct evidence where Defendant readily admits it considered Melvin's weight and determined a correlation between his obesity and his health. Moreover, Melvin does not allege that Defendant disqualified him

-14-

based on his appearance or merely due to a physical trait.  Rather, Melvin's claim is based on the fact that every reason provided by Defendant for its decision was associated with Melvin's health.  In other words, Melvin does not allege that Defendant disqualified him because it had issue with his appearance or because management held some stereotypical opinion that people who are obese smell, act lazy, or are unreliable.  Rather, Melvin's action is based solely on clear and direct evidence in which Defendant linked his obesity with his health and determined that he was medically unqualified to perform the duties of a Diesel Mechanic.  No further proof is needed beyond Melvin's disqualification letter.  Said correspondence states that Melvin is: "Not currently qualified for the safety sensitive mechanist position due to significant **health** and safety **risks associated with Class 3 obesity** (Body Mass Index of 40 or greater)."  (Doc #101-2, Melvin Dep. 52:25-54:7, Ex. 11) (emphasis added).

In addition to the disqualification letter, the testimony of Defendant's witnesses further demonstrate Defendant's intent.  For example, the difference between being qualified for the Diesel Mechanic position and being medically qualified for said position is a distinction made explicitly by the Defendant, as opposed to an inference argued by Melvin.  Clark, the individual who medically disqualified Melvin, stated:

Q.  I'm curious.  Counsel and you make this distinction between something being medically qualified and just qualified.  Why are you making that distinction?

A.  Well, because the person could, from an educational standard or a training standard, be qualified to perform the job duties, in other words, have the knowledge requisite for performing whatever, engineering, mechanical duties.

But from a – and the – the final determination as to whether the person is really hired or not came from the human resource department.  But there were protocols set up for medical qualification or disqualification.  So the role – especially in Mr. Morriss's case, my role was in that medical qualification or disqualification role.

I don't know physically and/or from an educational background or training background if he was qualified to become a mechanic or do mechanic job.  That would be, normally was, the role of the supervisor.

-15-

(Doc #101-4, Clark Dep. 37:14-38:9).  Clark further testified:

> Q.  Okay.  Were you the particular BNSF medical review officer that made the determination that Mr. Morriss was not currently qualified for the safety sensitive position of machinist?
>
> A.  I made the determination that he wasn't medically qualified for the position, yes.
>
> Q.  And that was your determination using that he wasn't medically qualified, isn't that right?
>
> MS. BOGEN:  I'll object to the form of the question.
>
> A.  Well, I – I reviewed the documents.  And I made the decision, based on BNSF protocol, that he was not medically qualified.
>
> Q.  Okay.  So you would use the term "qualified," isn't that right?
>
> A.  Medically qualified.

(Doc #101-4, Clark Dep. 34:11-35:1).

If Defendant's decision to revoke Melvin's conditional offer was not tied to Melvin's health, why was the decision to disqualify Melvin made by Defendant's medical officer who never personally met and examined Melvin?  Had the decision not to hire Melvin been based solely on a physical trait, then the decision to not hire him would have been made by the Defendant's employees who personally viewed Melvin.  But after being interviewed and passing the physical capability requirements, Melvin was extended a conditional offer of employment.  It was only once the Defendant's medical team assessed Melvin's paperwork did Defendant consider him unfit for the position.   On this basis, there is no comparison between the circumstances involving Melvin and the employees in *Powell* and *Sibilia*.

It is important to note that even the court in *Powell* suggests that to be regarded as being impaired on the basis of weight, such a threshold is not a burdensome requirement. The court stated:

> Of course, weight can be a physical impairment or, more precisely, an employer may perceive an employee's overweight status to constitute a physical

-16-

> impairment. For example, suppose an employer believes that an overweight job applicant cannot climb a ladder, or walk across a parking lot, or climb flights of stairs, and therefore does not hire the overweight individual for a job that requires such activities. That might give rise to "regarded-as" status for an ADA claim in the post-ADAAA world. But that is not what we have here.

*Powell,* 2014 U.S. Dist. LEXIS 17709 at *31.  *Cf EEOC v. Texas Bus Lines,* 923 F. Supp. 965, 969 (S.D. Tex. 1996) (pre-ADAAA case where court found employee could be regarded as being disabled due to her obesity without introducing any direct evidence as to the cause of her obesity and where court did not require proof of a physiological condition as the cause for plaintiff's obesity). See also  *Whittaker v. America's Car-Mart, Inc*., 2014 U.S. Dist. LEXIS 56919 **1-5 (E.D. Mo. Apr. 24, 2014) (referencing 42 U.S.C. § 12102(4)(A) (denying an employer's motion to dismiss the complaint of an employee who alleged he was regarded as being disabled based on his severe obesity, but whom did not allege that the obesity was tied to a physiological condition. The court rejected the motion to dismiss on the basis that "Congress mandated in the ADAAA that the definition of disability be construed 'in favor of broad coverage of individuals . . . to the maximum extent permitted' by the law.").

In this proceeding*,* the actions of Defendant go well beyond what the *Powell* court suggests is necessary in order to be deemed impaired on the basis of weight.  Defendant's disqualification letter specifically stated Defendant's decision was based on Melvin's obesity, and Defendant's disqualification letter also associated Melvin's obesity to his overall health. Moreover, while the *Powell* and *Sibilia* courts only considered the employees' obesity as a stand alone impairment, in this proceeding, the Defendant has tied Melvin's obesity to a fear that he will likely develop future health conditions.  After all, Clark, the witness responsible for making the decision to disqualify Melvin testified that she made the decision based on Melvin's obesity and because of the future impairments Melvin was likely to encounter.  Moreover, Jarrard

testified that Melvin was disqualified based on the risk that he would develop a future condition (i.e. sleep apnea, diabetes, cardiac disease, etc.). Consequently, for each and every one of these reasons, Defendant's Motion for Summary Judgment must be denied.

### C.  Melvin's Obesity Constitutes a Disability Under the ADA.

Notwithstanding Defendant's attempt to make this matter solely about obesity, courts have found that severe obesity can be a disability, whether tied to a physiological condition or not.  In *EEOC v. Res. for Human Dev., Inc*., 2011 U.S. Dist. LEXIS 140678, * 13 (E.D. La.  Dec. 6, 2011) the court stated:

> A careful reading of the EEOC guidelines and the ADA reveals that the requirement for a physiological cause is only required when a charging party's weight is within the normal range. 29 C.F.R. § 1630.2(h). However, if a charging party's weight is outside the normal range-that is, if the charging party is severely obese-there is no explicit requirement that obesity be based on a physiological impairment.

*Id*.  The court ultimately held: "[t]herefore, according the EEOC Guidelines to the ADA the appropriate deference [sic], the Court should recognize that severe obesity qualifies as a disability under the ADA and that there is no requirement to prove an underlying physiological basis."  *Id*. at * 15.  Defendant's own medical literature categorizes Melvin's Class III obesity to be "extreme obesity" (SSOF ¶1)

Defendant's expert witness, Jarrard referred to only two specific studies in forming each and every one of his opinions to justify Defendant's treatment of Melvin, namely, the 2000 Practical Guide and the 1998 Clinical Guidelines.  (SSOF ¶6).  On page one of the 2000 Practical Guide, it states, "Obesity is a chronic disease." (SSOF ¶7).  Moreover, on page XI of the 1998 Clinical Guidelines, the Executive Summary States: "Obesity is a complex multifactorial chronic disease that develops from an interaction of genotype and the environment." (SSOF ¶7).

## II. DEFENDANT FAILED TO PROVE THAT PLAINTIFF'S OBESITY IS "TRANSITORY AND MINOR."

Defendant argues that Melvin cannot support his regarded as claim because his obesity is transitory and minor.  It is correct that a "regarded as" claim shall not apply to impairments that are both transitory and minor.  A transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B); 29 C.F.R. § 1630.15. Neither the statute nor implementing regulations define an impairment that is minor. However, this exception "should be construed narrowly." H.R. Rep. 110-730, pt. 1, at 14.

> The intent of this exception is to prevent litigation over minor illnesses and injuries, such as the common cold, that were never meant to be covered by the ADA.

154 Cong. Rec. H6067 (2008).

First, the transitory and minor exception to a regarded as claim is an affirmative defense; and as such, it is not Melvin's burden to prove his condition is not transitory and minor. 29 C.F.R. § 1630.15. As an affirmative defense, it must be set forth in the Defendant's responsive pleading under Fed. R. Civ. P. 8(c). See *First Union Nat. Bank v. Pictet Overseas Trust Corp., Ltd.*. 477 F.3d 616, 622 (8th Cir. 2007).  Thus, Defendant's failure to assert the affirmative defense in its Answer should result in a waiver of that defense. (Doc #6 p. 4-6)  It is unfair surprise and prejudicial to Plaintiff to raise this affirmative defense after the close of written discovery and when Plaintiff is foreclosed from addressing this issue with Defendant's witnesses that were deposed in this matter.

Second, to establish this defense "a covered entity must demonstrate that the impairment is **both** 'transitory' **and** 'minor.'" 29 C.F.R. § 1630.15. (emphasis added). Defendant has failed to meet its burden of proof on both issues.  Defendant failed to establish that Melvin's

-19-

impairment was "transitory" because all the evidence and testimony presented in this case shows that Melvin suffered from the disease of obesity for at least six months and there was no expectation that Melvin's condition would be resolved within six months. Defendant argues that Melvin's impairment was transitory because Melvin lost weight in March 2011 and his BMI dropped below 40 to a 39. However, these facts only prove that Melvin's weight had fluctuated and not that Melvin's obesity was gone. Even with some weight loss, Melvin was still obese, even under Defendant's own medical literature. (SSOF ¶1)(BMI of 39.9 to 35.0 Class II Obesity). Defendant's own policy requiring applicants to lose weight and maintain it for at least six months before reapplication recognizes that fluctuations in a person's weight are not permanent and not indicative of whether the obesity is gone.

Additionally, Defendant has no support for its claim that "presumably" Plaintiff could have continued to lose weight. Melvin testified that he struggled with his weight since high school and that he only lost weight through the use of prescription drugs and medical intervention. (Doc #101-2, Melvin Dep. 9:14-20, 10:23-25, 11:1-3; 12:7-10; Doc #101-6 Pees Dep. 31:5-33:23). During his deposition, Melvin testified that he had weighed between 280 to 300 since 2009, and that on the day of his deposition, October 11, 2013, he weighed 285. (SSOF ¶2). Furthermore the medical records from Dr. Pees' office on July 12, 2012 documented Melvin's weight as 289.7lbs (BMI: 41.72) and shows that Plaintiff was still suffering from obesity. (SSOF ¶3).

Defendant also failed to establish that Defendant's obesity is "minor." Defendant cited no evidence and articulated no argument as to why Defendant's obesity should be considered a minor impairment. In fact, Defendant goes to great lengths in this case to convince the Court that Melvin's obesity puts him at "extreme risk" for secondary diseases that would make him a

danger to himself and others. Defendant's position on its direct threat defense would be logically inconsistent with maintaining that Melvin's obesity is minor. The fact that morbid obesity must be treated by a medical professional with medical intervention such as prescription drugs and surgical procedures certainly negates the argument that morbid obesity is minor and distinguishes it from a common cold or flu.

Defendant claims that it subjectively believed that Melvin's obesity was transitory and minor, however, the standard is one of objectivity and not subjectivity. The relevant inquiry is whether the actual or perceived impairment on which the employer's action was based is objectively transitory and minor, not whether the employer claims it subjectively believed the impairment was transitory and minor. 29 C.F.R. § 1630.15; 29 C.F.R 1630 APPENDIX. Therefore, whether Defendant perceived Melvin's obesity as transitory and minor is irrelevant. Instead, Defendant would have to demonstrate Melvin's obesity was objectively transitory and minor. As argued above, there is no evidence that Melvin's obesity lasted less than 6 months or that Melvin's obesity was minor.

## III. DEFENDANT CANNOT SUCCEED ON ITS "DIRECT THREAT" AFFIRMATIVE DEFENSE.

Defendant attempts to avoid liability by arguing the affirmative defense that Melvin's medical condition placed him as a "direct threat."  Of course, such argument is counter to Defendant's position that it did not regard him as being impaired.  Obviously, under the ADA, an employee cannot be a direct threat without having an impairment, or without being regarded as having an impairment.   "A 'direct threat' is defined under the ADA as a 'significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.'" *Gaus*, 2011 U.S. Dist. LEXIS 111089 at **63-64 (quoting 42 U.S.C. § 12111(3)).

Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

(1) The duration of the risk;

(2) The nature and severity of the potential harm;

(3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm.

*Id*. at *64 (quoting 29 C.F.R. §1630.2(r)).  Moreover, "[t]he employer bears the burden of proving that an employee . . . poses a direct threat."  *Id*. at *65 (citations omitted).

The Supreme Court has further explained that "[t]he exception can only be invoked where a risk is significant: 'because few, if any, activities in life are risk free . . . the ADA does not ask whether a risk exists, but whether it is significant.'" *Doe*, 242 F.3d at 447 (quoting *Bragdon*, 524 U.S. at 649, 118 S.Ct. 2196) (emphasis added). A slightly increased risk, a mere speculative or remote risk is insufficient; there must be a high probability of substantial harm. 29 C.F.R. § 1630.2(r). In conducting this evaluation, courts and entities "must rely on evidence that 'assesses the level of risk' for the 'question under the statute is one of statistical likelihood.'" *Id*. (quoting *Bragdon*, 524 U.S. at 625, 118 S.Ct. 2196). This "rigorous objective inquiry" must be based on medical or other objective evidence, applying the four factors set out in *Arline*. *Bragdon*, 524 U.S. at 626, 118 S.Ct. 2196; *see also Haas v. Wyo. Valley Health Care Sys.*, 553 F.Supp.2d 390, 398 (M.D.Pa.2008). Relevant here, "a health care professional . . . [has] the duty to assess the risk . . . based on the objective, scientific information available to him and others in his profession. His belief that a significant risk existed, even if maintained in good faith, [will] not relieve him of liability." *Bragdon*, 524 U.S. at 649, 118 S.Ct. 2196.

*Id*. at **65-66 (quoting *EEOC v. Hussey Copper Ltd.*, 696 F.Supp. 2d 505, 520 (W.D.Pa. 2010)).

*Gaus* involved an employee who worked for a railroad as an electrician.  *Id*. at *4.  His position was deemed to be a safety-sensitive job.  *Id*.  The employee had a history of medical conditions that often caused him to miss work.  *Id*.  Upon attempting to return from his most

recent approved leave, due to a variety of health conditions, the employer's medical department refused to clear the plaintiff and continuously requested additional information from his treating physicians.  *Id.* at **9-10.  Of primary concern to the employer was that the employee listed certain medications he was taking on his return to work application and the employee's history of chronic pain.  *Id.* at *10.  Despite the medication and the chronic pain, the employee's physicians concluded that the employee was clear to work without restrictions.  *Id.* at **10-12. For approximately a two year period, the employer refused to allow the employee return to work because the medication he was prescribed was not in compliance with the employer's medical guidelines for safety sensitive positions and because the employee continued to experience chronic pain.  *Id.* at *18. In reviewing the employers actions, the court in *Gaus,* as discussed below, found that the employer did not meet its burden with respect to establishing all but one of the direct threat factors.

### A. Defendant Cannot Establish The Duration of The Risk Creates a Direct Threat.

When applying the "direct threat" defense to the evidence, the *Gaus* court found that the employer failed to meet its burden.  With respect to the "duration of the risk" factor, the employer argued that taking medication while working in a safety sensitive position presented a risk of temporary impairment.  *Id.* at 67.  However, the court found that the employer had no objective evidence that the employee was actually experiencing any side effects from his medications that affected his ability to function in his job.  *Id.*  The court further explained, "merely referring to [the employer's] medication guidelines, without any consideration of how a particular employee is affected by the medications does not provide the individualized assessment required under the ADA."  *Id.* at *67-68.

-23-

Similarly, just as the employee in *Gaus* was susceptible to suffering from the side effects associated with his medication and thus theoretically posed a direct threat, Defendant alleges that Melvin was a direct threat in that he was theoretically susceptible to developing a health condition that could then place him at an increased risk of one day suffering an incapacitating event while on the job.   Just as in *Gaus*, Defendant failed to perform an individualized assessment of Melvin, and merely made its decision based on its protocol concerning individuals seeking employment with BMIs of 40 or above in safety sensitive positions.   Defendant never considered the likelihood that Melvin himself would likely encounter a sudden incapacitating event while on the job.   Rather, Defendant only considered general studies which discuss how Class III Obese individuals, as a population group, are at greater statistical likelihood of developing certain diseases – e.g. diabetes, sleep apnea, coronary disease, etc.   However, just as failing to assess the risk on an individualized basis precluded the employer in *Gaus* from establishing that it met its burden in satisfying the "duration of the risk" factor, Defendant's arguments, as a matter of law, must also fail.

### B.   Defendant Cannot Establish The Likelihood That the Potential Harm Will Occur or the Imminence of the Potential Harm.

In *Gaus*, the court agreed that the employer established the severity of the potential harm, but it then considered whether the employer met its burden in establishing the likelihood that the potential harm would occur and the imminence of the harm.   *Id*. at **69-83.   The *Gaus* court concluded that the employer failed to provide any objective evidence which showed that because of the employee's impairment, that the likelihood of potential harm was very real.   *Id*. at **68-69.   All the employer in *Gaus* provided were conclusory statements such as, "that the calculation for likelihood of potential harm 'is not subject to scientific measurement,'"  and that "'employer need not wait to respond to risk of harm until someone is hurt.'" *Id*. at *69.   However, such

-24-

general statements were not sufficient for the employer to meet its burden that the likelihood of harm was significant.  *Id*. at *69.  The court found, "[the employer] did not address evidence to show a significant risk of harm exists or that the likelihood of that harm occurring is substantial." *Id*.  Moreover, the court stated:

> the objective evidence here does not suggest that the risk of injury was sufficiently likely to occur at any given moment, i.e., that Gaus would have suddenly become impaired or distracted due to his chronic pain condition and medication regimen. NSR's argument might have some merit if it offered objective evidence to show Gaus was experiencing side effects from his medications that would impair his ability to function in his job. This kind of evidence, however, is absent from the record.

*Id*. at *70.

In this action, Defendant's explanations are even more speculative than the employer's arguments in *Gaus*.  In *Gaus*, the employee was actually suffering from chronic pain and was taking narcotics.  It was those reasons for which it determined the employee was a direct threat.  However, as discussed *supra*, in this action, the Defendant does not argue that Melvin was **currently** suffering from any condition that posed a direct threat.  Rather, Defendant argues that Melvin was at risk for someday developing a secondary condition(s), and if he in fact developed said condition(s), only then was he at risk for suffering an incapacitating event.  Under no scenario can this type of reasoning support a direct threat defense.

     **1.**     **Defendant cannot argue the likelihood of potential harm or the imminence of the harm based only on conditions which Melvin did not have at the time he was disqualified.**

Defendant readily admits that the health risks that caused it to deny Melvin's employment was do to a fear that Melvin would develop a secondary disease or diseases in the future.  Clark testified:

> Q. So what about Mr. Morriss's BMI would make him unable to perform safely – you know, tasks safely, in that type of manner that you have described?

-25-

A.  Well, he – he could have some risk factor, some health risk factor, that would – could impact his ability to perform his job safely and/or could increase his risk of developing a health risk factor that could affect his ability to perform his job safely.

(Doc #101-4, Clark Dep. 89:8-17).  These same risks were thoroughly discussed by Jarrard in his deposition.  (Doc # 101-7, Jarrard Dep. 30:21-33-18).  However, Defendant has no objective evidence, nor did it consider any evidence that Melvin would develop any of these conditions. Again, Clark testified that she did not have any evidence that Melvin suffered from sleep apnea, coronary disease, diabetes, or any other disorder. (Doc #101-4, Clark Dep. 90:4-12).  Moreover, Jarrard, in defending Defendant's position could only site to studies that discuss how obesity places individuals at a greater risk of developing secondary diseases.

However, Defendant cannot rely on these studies in place of performing an individualized assessment of Melvin.  In addition, these studies do not address the actual threat of sudden incapacitation.  Rather the studies only discuss the "relative risk" that someone who is obese will develop a future disease.  Page 59 of the 1998 Clinical Guidelines states, "[t]t should also be noted that the risk levels shown for each increment in risk are relative risks; that is, relative risk at normal weight.  They should not be equated with absolute risk which is determined by a summation of risk factors."  (SSOF ¶6).  In other words, the studies only speak to the likelihood that people who are Class III Obese will develop a disease as compared to non-obese individuals.  The studies do not speak to the likelihood that Melvin will actually develop a disease, or that any Class Three Obese person will develop a disease.  In fact, the 1998 Clinical Guidelines state: "[a]ssessment of a patient's absolute risk status requires examination for the presence of: *Disease conditions:* established coronary heart disease (CHD), other atherosclerotic diseases, type 2 diabetes, and sleep apnea; patients with these conditions are classified as being at very high risk for disease complications and mortality." (SSOF ¶6).  (emphasis in original).

As stated above, the Defendant did not conduct an individualized assessment of Melvin in order to determine his actual risk. If it had, it would have found that Melvin did not have coronary disease, diabetes, sleep apnea, etc.

> **2. Defendant admittedly employs individuals in safety sensitive positions who are diagnosed with diseases for which Defendant claims create a direct threat.**

Furthermore, Defendant's direct threat analysis is fatally flawed because as much as Defendant speaks to the likelihood that Class III Obese individuals will suffer some future disease, even if statistically true, it has offered no objective evidence that such would necessarily make Melvin a direct threat. After all, Defendant admits that it will hire people with sleep apnea, diabetes, coronary disease, etc. (See Doc #101-4, Clark Dep. 49:2-18, 62:4-9, 49:23-51:20) Logically speaking, it makes absolutely no sense to refuse to hire someone who is merely at risk for developing a condition by labeling said person as a direct threat, while openly admitting that it will hire people who actually have the feared condition. Without question, Defendant is playing fast and loose with the law in this regard. In fact, Melvin's physician, Dr. Pees testified, that despite Plaintiff's obesity, he was at less of risk from suffering the negative effects associated with such health conditions like diabetes and hypertension as compared to a person who has in fact been diagnosed and treated for having said conditions. (SSOF ¶9).

Jarrard attempts to bridge Defendant's illogical position by arguing: (1) that Melvin is a direct threat because Melvin's co-morbidity risks differentiate him from someone who has a known condition, but where said condition is controlled, and (2) that a person who does not have a condition is more of a risk because said individual is likely to first learn of having developed said condition only after experiencing a sudden incapacitating event while on the job. (SSOF

¶8).  However, neither of these opinions are based on statistical likelihood nor are they based on

any objective scientific information as the law requires.  Jarrard stated:

> Q. Right.  Okay. And if they [a person who is class three obese] do[es] not have
> diabetes at that moment, between those two individuals [the class three obese
> individual without diabetes and the non-obese person with controlled diabetes],
> which is at greater risk of suffering a incapacitating event related to diabetes
> while on the job?
>
> A. I would still say the – the person with the BMI of 40 has a greater risk of being
> incapacitated.
>
> Q. What is the basis for that opinion?
>
> A.  The -- Again, the diabetic -- the nonobese diabetic that we've qualified, we've
> evaluated their potential for being incapacitated.  And we would only qualify
> somebody that we felt comfortable had their situation managed -- well managed.
> They were compliant with meds.  They either never got low blood sugar or they
> could easily recognize it and rescue themselves. So incapacitation, you know
> what your risk is and it - And we would approve them only if we understood it to
> very low risk.  The person with a BMI 40 who does not today have diabetes, we
> talked about it earlier, their risk of getting diabetes or developing it is much
> greater.  And, unfortunately, the very first time they have symptoms are -- is
> likely to be when their blood sugar is going so high that they're becoming
> potentially incoherent or potentially it -- become incapacitated. So it's a -- With a
> BMI 40, you have the, you know, not just today's risk that we're looking at, but
> these people are going to be doing this job for, hopefully, a whole career.  And
> somewhere in that future, in the near future, they are likely, more likely -- on a
> more likely than not basis, given that over half of that population is likely to
> develop diabetes, so on a a more likely than not basis, they will have diabetes
> show up.  It's first presentation can be in the form of some kind of incapacitation.

(SSOF ¶8).

As Plaintiff argued in his Motion to Exclude Expert Testimony (Doc ##102, 103 and

105), Jarrard has absolutely no basis for asserting these opinions.  He sites no studies to support

these opinions, he is unaware of any scientific information that supports these opinions, and he

does not refer to any on the job situations in which these opinions have proven to be true.

Rather, the opinions are mere conjecture and speculation which: (1) do not support Defendant's

Motion; (2) do not, as a matter of law, meet the burden of establishing a direct threat affirmative

-28-

defense; and/or even (3) create a genuine issue of fact as to whether Melvin was a "direct threat." Consequently, Defendant has failed to meet its burden in establishing a direct threat affirmative defense.

### 3. Defendant admits that under certain circumstances it will allow a Class III Obese employee to transfer from a non-safety sensitive position to a safety sensitive position.

Defendant's policy is based on Defendant's claim that "the probability that people with class three obesity will develop one of these medical conditions [diabetes, sleep apnea, coronary diseas, etc.] is so high it's unacceptable to us [Defendant] to accept that level of risk in these safety sensitive jobs." (SSOF ¶6).However, this assertion is further undermined by Defendant's acknowledgment that it allows currently employed individuals, whom are Class III Obese, to transfer from non-safety sensitive positions into safety sensitive positions. Jarrard stated:

> Q.    With regards to – Let's talk about outside the State of Montana.  If you have a person already working for BNSF in a nonsafety sensitive position, if they choose to apply for a safety sensitive position can they be medically qualified to work if they have a BMI of 40 or above?
>
> A.    Its possible.

(SSOF ¶10).  Jarrard digs Defendant into an even a deeper hole when he attempts to explain the Defendant's position for allowing certain employees with BMIs of 40 or above to transfer into safety sensitive positions.  Jarrard testified:

> Q.    And you can make a determine – Is there a reason that they are – that those individuals [in craft transfers with BMIs of 40 or above] are less at risk of the problems associated with class three obesity than external candidates?
>
> A.    No.  They have the same risks.  We just as a company made a decision that for craft transfers, which is what we call this, they transfer from one craft to another, we – we extend that and we're willing to accept that small increase in risk based on the fact that it's a very small number people and the fact that they are incumbent employees so we give them the privilege, if you will, or the ability to craft transfer.  And we recognize that there's an increased risk.  They have the same risks, but we have chosen to accept that.

Q.      Do you know why BNSF has chosen to accept that risk?

A.      I mean, I know – I know we have.  I can't tell you of a specific set of criteria or why, but, you know, I know for me personally it's – we have a group of people that already under this culture of the company, the safety rules of the company for the most part, and so they – they – they're kind of part of the company already.  I mean, there's not an established list of criteria to answer your question why.

Q.      Was there a reason why you do not do the same individualized assessment for external candidates seeking employment in a safety sensitive position?

A.      Well, again, at – the external candidates are many more in number, so much more number.  There's not much craft transfer that goes on.  There really isn't.  Especially into safety sensitive.  Most of people that craft transfer are from one safety sensitive job to another.  It's quite rare that somebody goes from nonsafety sensitive to safety sensitive.  So the risk, therefore, is much greater when you have an external population coming into the work force, novel people coming in, as opposed to existing people transferring from one craft to another.  So it's, again, it's a matter of risk and – and relative risk.  And the relative risk of many potential applicants, external applicants versus a very rare internal applicant.

Q.      Well, what's the methodology you're using to state that external candidates have an increased risk over internal candidates when – when both individuals may have a BMI of 40 or more?

MS BOGEN:  Object on form as misstating his testimony.

THE WITNESS:  The increased risk I refer to is in the numbers.  Again, risk is probability, so it's all about how many people are in an at-risk category and then some percentage of those people will have potential incapacitating event or some other injury.  So when you have a very – rare internal craft transfer, that's – that's one potential person that has an increased risk.  When you have external candidates and you're looking at a larger population of people coming in, that's many, many more times the risk, based on numbers of people coming in, so your probability of an actual, bad catastrophic event happening is much greater when you have multiple people with the same level of risk, as opposed to a single or very rare internal person.

Q.      Well, what's the data that you're using to form that opinion?

A.      Simple probability.  It's basically mathematics.  I mean, many people with high risk versus a very rare person with high risk, it's just logical that there's much more risk in a population with more people.

(SSOF ¶10).

-30-

Apparently craft transfers are afforded the privilege of being a direct threat.   However, again, Jarrard provides no real basis for his assumptions that hiring Melvin would increase the risk of harm.  Moreover, Jarrard cannot back up his assumption that its policy is actually keeping *many* people with a high risk from being employed in safety sensitive positions.  Jarrard testified as follows:

> Q.      No, that's all right.  Since 2002 when BNSF implemented its current national policy concerning employment of individuals in safety sensitive positions, do you know how many candidates your department has considered who like Mr. Morris, have had a BMI of 40 or above?
>
> A.      Are you talking nationwide, not Montana now?
>
> Q.      Right.
>
> A.      I don't know.
>
> Q.      Again, would you say that there's been hundreds of, of employees that your department has considered or not that many?
>
> A.      Since 2002 we're talking?
>
> Q.      Yes.
>
> A.      Nationwide?
>
> Q.      Yes. Safety sensitive positions –
>
> A.      Right.
>
> Q.      -- and having BMIs of 40 or above.
>
> A.      Yeah, nationwide it's probably in the hundreds.

(SSOF ¶11).

Jarrard assumes Defendant's policy with respect to allowing craft transfers is a negligible risk compared to allowing external candidates into said positions, but he has no means of verifying the accuracy of his assumptions.  In fact, Jarrard doesn't know how many employees have transferred into safety sensitive positions while having a BMI of 40 or above. (SSOF ¶12).

He doesn't know if any of the incumbent employees who have transferred into safety sensitive positions have been involved in any sudden incapacitating events. (SSOF ¶13).    And, as sated above, he does not know how many external applicants were denied employment solely on the basis of having a BMI of 40 or above.  As such, Jarrard's opinions with respect to this issue cannot meet the burden of establishing a direct threat defense.

       **4.   Defendant will medically qualify Class II Obese employees into safety sensitive positions, but cannot differentiate said risk compared to a Class III Obese employee.**

Defendant's argument that its treatment toward Melvin was justified on the basis of Melvin was a direct threat is further undermined by how Defendant treats individuals with Class II Obesity.  Defendant is unable to determine the likelihood of a person with a BMI of 39, an individual with Class II Obesity, will develop future diseases as compared to an employee like Melvin who is Class III Obese with a BMI of 40.7. (SSOF ¶16).  Nevertheless, Defendant treats the potential employees far differently.  Jarrard testified as follows:

> Q.    Regarding – How about when it comes to people with a BMI of under 40, lets say 39, do you have a different practice [for medically qualifying such candidates]?

> A.    We do.

> Q.    Could you describe what that practice is?

> A.    Sure.  BMI of 39 falls in what's called class two obesity.  And, again, the reasoning or the practice is we ask those folks to provide additional information so we can better clarify the risks that they might present in the safety sensitive jobs.  So we ask, for instance, for a sleep study because the prevalence of sleep apnea is really high.  It's higher in class three of course, but it is high in class two, so we ask for a sleep study, as well as some other doctor reports.

> Q.    What other reports –

> A.    Well

> Q.    – do you typically ask for?

-32-

A.      Yeah. Typically we ask for their doctor to evaluate them for cardiac risk factors and leave that somewhat to the the discretion of the doctor, but we specify a few things.  A glucose test to add to make make sure if – what their diabetes status might be or pre diabetes status. We measure blood pressure, but we ask the doctor to evaluate that, smoking history and other cardia risk factors that doctor feels are appropriate, other than family history.  We specifically exclude that.

(SSOF ¶ 14).

In other words, had Melvin had a BMI of 39, he would have been granted an individualized assessment by the Defendant.  But because Melvin had a BMI of 40.7, Defendant, due to a blanket policy, never bothered to perform said evaluation.  Yet, when Jarrard was asked to quantify the increased risks of suffering a sudden incapacitating event between an employee with Class II Obesity and Class III Obesity, he was unable to do so.  Jarrard stated:

Q.  What is the likelihood of a employee that's class two obesity category, working in a safety sensitive position suffering an incapacitated--incapacitating event while on the job?

A.  I've not done an exact calculation and I don't know that anybody has, so I can't tell you an exact probability or likelihood.

Q.  Can you give me an estimate?

A.  No.  I know it's less than somebody in class three, though.

Q.  How much less than somebody in a class three?

A.  Again, there are -- there is literature out there on specific conditions, looking at the prevalence or incidence in a class two population versus a class three population.   How many of those were done on the basis of a sudden incapacitation, I don't know.   Usually those research projects are done on the diagnosis, prevalence of the diagnosis, so I don't know that your question is answerable in the medical literature.

Q.  Have you researched whether or not it is answerable within the medical research?

A.  I've looked -- I mean, I do try to review literature where they stratify the risks based on class one, class two and class three obesity, and to my knowledge I've not seen that sort of issue, that relative issue specifically addressed by any science

(SSOF ¶ 15).

-33-

Defendant has drawn a clear distinction between Class II Obesity and Class III Obesity, but cannot articulate a rational justification, based on medical information or statistical likelihood, for its policy.

Indeed, Defendant has no basis for claiming that Melvin was a direct threat. Even the person who made the decision to medically disqualify Melvin could not attest to whether Melvin was in fact a direct threat. Clark testified:

> Q.   Okay.   So I want to know, though, in your review of the medical documentation, if you have an opinion that Mr. Morriss was a safety risk to himself?
>
> A. I don't have an opinion.
>
> Q. Okay. What about whether or not he was a safety risk to others, him personally?
>
> A. I don't have an opinion.

(Doc #101-4, Clark Dep. 98:25-99:9).  After all, if Defendant's own medical officer who made the decision to medically disqualify Melvin cannot state that Melvin was a direct threat, certainly this Court cannot as well.

Defendant's policy of excluding Class III Obese applicants for safety sensitive positions, based solely on having a BMI of 40 or above, without doing any individualized assessment, is a blatant violation of the law. Instead of providing an individualized assessment, Defendant simply applied a blanket application of its medical policies.  Just as in *Gaus*, where a blanket application of medical guidelines was insufficient, so is the same in these proceedings.  "[A]n individualized inquiry . . . is essential if § 504 [of the Rehabilitation Act] is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of [employers] as avoiding exposing others to significant health and safety risks."  *Gaus*, 2011 U.S. Dist. LEXIS 111089 at *89 (quoting *Arline*, 480 U.S. at 287).

-34-

Defendant cannot support its position that hiring Melvin would have created a direct threat because its policy is not based on any evidence of statistical significance and its policy was not based on any rigorous inquiry which considered objective scientific information.  Moreover, the rationale for its policy is completely undermined by Defendant's allowance of internal candidates with BMIs of 40 or above to move into safety sensitive positions while excluding external applicants.  For these reasons, Defendant's Motion for Summary Judgment must fail as a matter of law.

## IV.  DEFENDANT FAILED TO PROVE ITS AFFIRMATIVE DEFENSE THAT ITS QUALIFICATION STANDARD IS A PERMISSIBLE BUSINESS NECESSITY.

Defendant argues that its prohibition on hiring individuals with a BMI of 40 or above is permissible because it is "job-related and consistent with business necessity." (Doc #97 p. 34). The ADA provides an affirmative defense to a charge of discrimination involving the application of a qualification standard that would screen out or otherwise deny a job or benefit to an individual with a disability if an employer can show that standard is job-related and consistent with business necessity, and such performance of the job cannot be accomplished by reasonable accommodation. *Hohn v. BNSF Ry. Co.*, 2007 U.S. Dist. LEXIS 72297, 13-15, 2007 WL 2822754 (D. Neb. Sept. 26, 2007)(citing 42 U.S.C. §12113(a)). Again, an affirmative defense must be set forth in the Defendant's responsive pleading under Fed. R. Civ. P. 8(c), and Defendant's failure to assert in its Answer (Doc #6 p. 4-6) should result in a waiver of that defense. See *First Union Nat. Bank v. Pictet Overseas Trust Corp., Ltd.*. 477 F.3d 616, 622 (8th Cir. 2007)

Additionally, the employer bears the burden of proving that its qualification standard satisfies the business necessity defense, which "'is quite high, and is not to be confused with mere expediency.'" *Indergard v. Georgia-Pacific Corp.*, 582 F.3d 1049, 1057 (9th Cir. 2009)

-35-

(quoting *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001)).  If an employer meets its burden of showing that the qualification standard at issue is job-related and consistent with business necessity, the burden then shifts to the employee to show that a reasonable accommodation exists that would satisfy the qualification standard. *Moses v. Am. Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996).

Because Defendant argues that its qualification standard of not hiring applicants with a BMI of 40 or above is necessitated by its concern for employee safety, the analysis of whether Defendant has carried its burden to prove a business necessity defense is essentially the same as a "direct threat" analysis.  An employer's qualification standards may include "a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b). *Hohn*, 2007 U.S. Dist. LEXIS 72297 at **13-15.  The Third Circuit Court of Appeals has set forth the applicable standard to determine whether an employer may invoke the business necessity defense when using safety as its qualification standard:

> [A] factfinder must face the same concerns that the Supreme Court addressed in Arline about the nature of the risk, the duration of the risk, the severity of the risk, and the probabilities that the disability will cause harm. See Arline, 480 U.S. at 287, 107 S.Ct. 1123. For a safety qualification to meet the business necessity defense, it must be based on current medical knowledge about the disability and on the real risks that the disability may present. Any jury considering this defense [94] should be instructed not to base its determination on unfounded fears, but only on medically accurate facts. Even an employer's good faith actions will not save him if the employer is misinformed about the realities of the disability. In such a case, the jury should "assess the objective reasonableness of the views of health care professionals without deferring to their individual judgments." Bragdon v. Abbott, 524 U.S. 624, 650, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

*Gaus*, 2011 U.S. Dist. LEXIS 111089 at **92-94.

Defendant's claims under a business necessity defense fail for the same reasons articulated above in response to Defendant's claims on direct threat, namely that Defendant provides no credible evidence of a real risk posed by the condition of obesity. Defendant admits that prior to implementation of its qualification standard related to BMI in 2002, it had no statistical data on how many individuals it employed with BMIs over 40 and that no statistical data was used to influence the implementation of its policy. (SSOF ¶4).  In 2002, Defendant implemented its qualification standard related to BMI in response to medical literature from the National Heart Lung Institutes showing the increased likelihood of obese people developing future diseases compared to the non-obese population. Not because of any specific safety issues that were occurring prior to 2002.  (SSOF ¶5). Moreover, the fact that Defendant does not apply this qualification standard in Montana, albeit under administrative and judicial order, severely undercuts Defendant's claims that its business operations and safety require limiting employment to those individuals with a BMI of 39 or below.

Finally, to succeed under both business necessity and direct threat defenses, the claimed risk to the health or safety of others cannot be eliminated by reasonable accommodation. *Gaus*, 2011 U.S. Dist. LEXIS 111089 at **92-94.   Defendant argues that the risk it is most concerned about is that a morbidly obese individual would someday unwittingly develop a secondary disease like diabetes, hypertension and sleep apnea, and as a result, they will suffer an episode of incapacitation at work related to the secondary disease.   Aside from the obvious lack of documented medical support for Defendant's fear of sudden incapacitation, there is no evidence to suggest there are no reasonable accommodations that could be made to mitigate this supposed risk.   For example, Defendant could require morbidly obese employees in safety sensitive

-37-

positions to undergo periodic physical examinations for the purpose of discovering and treating secondary disease.

## V. MONTANA HAS FOUND DEFENDANT'S CONDUCT TO BE DISCRIMINATORY

Defendant's policy against employing morbidly obese individuals in safety sensitive positions has been found to be discriminatory under Federal and state law in Montana. *See Bilbruck v. BNSF Railroad*, HRB Case No. 0031010549 (MT Dep't of Labor and Indus. August 3, 2004) available at http://assets.dli.mt.gov/erd/Human%20Rights%20Decisions/bilburckfad.pdf (last visited on August 28, 2014), *aff'd* by *Bilbruck v. Burlington N. & Santa Fe Ry. Co.*, 2008 Mont. Dist. LEXIS 177 (2008), *aff'd and remanded* by *Bilbruck v. BNSF Ry. Co.*, 2009 MT 216N, 2009 Mont. LEXIS 256 (Mont. Dist. Ct. 2009).  *See also Cringle v. BNSF Ry. Co.*, HRB Case No. 0081013108 (MT Dep't of Labor and Indus. September 2, 2009) available at http://assets.dli.mt.gov/erd/Human%20Rights%20Decisions/cringle_hod_tsp.pdf  (last visited on August 26, 2014).  *See also O'Dea v. BNSF Railway Company*, HRB Case No. 0051011210 (MT Dep't of Labor and Indus. May 15, 2007), available at http://assets.dli.mt.gov/erd/Human%20Rights%20Decisions/odea.pdf (last visited on August 26, 2014) *aff'd* by *BNSF Ry. Co. v. O'Dea*, 2008 Mont. Dist. Lexis 436 (Mont. Dis. Ct. 2008), *aff'd by Mont. Dep't Labor v. BNSF Ry. Co.,* 2009 MT 262N, 2009 Mont. Lexis 394 (Mont. 2009). Plaintiff recognizes that these decisions are merely persuasive law on the issues before this court, but nonetheless, they offer sound judgment and reasoning on Plaintiff's regarded as claim.

Specifically, the Montana Department of Labor and Industry found, and subsequent state and Federal courts have affirmed, that Defendant regarded applicants with a BMI of 40 or above as disabled by applying to them the statistical risks associated with the general population of morbidly obese people.

12. The railroad regarded Bilbruck as unable to safely walk over uneven surfaces for extended distances, to climb on and off railcars, to ride on the vertical ladder of moving railcars, to control the movement of railcars in railyards, to drive trains through communities at high speeds, to work up to 12 hours a time in a variable schedule, to work outdoors all types of conditions and remain alert and vigilant all times avoid potential hazards involved with the movement of trains. In short, the railroad regarded Bilbruck as unable to safely engage in skilled driving, operation of large and complex machinery and sustained heavy manual labor, among other tasks. Indeed, the railroad regarded Bilbruck as unable to safely to stay awake at work, adequately to rest and to sleep off duty, safely to do his physical labor, safely to bend his knees and even to avoid breaking his ankles. The railroad also regarded Bilbruck as unable to avoid heart disease and diabetes and the associated risks of sudden incapacitation or death while at work.

13. By regarding Bilbruck as a direct threat to himself and others and engaging in the listed conductor-trainee, train service and locomotive engineer tasks, the railroad necessarily regarding him as unfit and unable to work the entire range of jobs that would require he safely engage in any tasks requiring the same skills and abilities. The railroad necessarily considered Bilbruck substantially limited in the performance of a broad range of jobs (and outside life activities, for that matter).

14. Even if Bilbruck's obesity was not an actual physical or mental impairment, the railroad treated him as if he had a substantially limiting impairment.

15. The railroad's justification of its adverse action by alleged safety risks was pretextual, since it was not based upon any effort to verify actual safety risks individual to Bilbruck's actual condition, and no such actual safety risks existed.

*Bilbruck,* HRB Case No. 0031010549, pp.4-5

As a result of the liability imposed in these Montana cases, Defendant changed its hiring practice in Montana in 2010 for applicants with a BMI of 40 and above, by undertaking an individualized assessment of each applicant and requesting that their physician evaluate them specifically for risk factors associated with obesity. (Doc #101-8 p. 9:14-10:8). As Dr. Jarrard

testified, Defendant now performs individual assessments for all Montana applicants with a BMI of 35 and over, asking that the applicant be evaluated by their physician for sleep apnea, diabetes and cardiac risk factors.  (Doc #101-8 p.5:7-8:16). None of this information was requested of Melvin in this case, and a result, Defendant violated the ADA and NFEPA by failing to perform an individual assessment. (Doc #101-7, Jarrard Dep. 30:2-11).

## CONCLUSION

Melvin was not discriminated against by Defendant because of his weight - a physical characteristic.  Rather, Defendant discriminated against Melvin because of his health. Defendant determined that Melvin had "significant health and safety risks associated with [his] Class 3 obesity."  Defendant's blanket policy was an opportunistic attempt to statistically predict Melvin's future health diseases to which he was theoretically more exposed when compared to a general non-obese population.  The law prohibited Defendant from discriminating against Melvin due to an assumption that he would become sick in the future.  For these reasons, Defendant violated both Federal and Nebraska law.

Defendant's attempt to justify its conduct behind speculation and conjecture is as unavailing as Defendant's attempt to mischaracterize the science upon which it alleges to have relied upon.  Defendant has not met its burden in proving that it is entitled to its prayed for relief, and thus its Motion for Summary Judgment should be denied as a matter of law.

MELVIN A. MORRIS, III, Plaintiff

BY:    _____/s/ Ari Riekes_____
       Jennifer L. Turco Meyer, #23760
       Ari D. Riekes, #23096
       MARKS CLARE & RICHARDS, L.L.C.
       11605 Miracle Hills Drive, Suite 300

Omaha, NE 68154-8005
(402) 492-9800
fax: (402) 492-9336
E-mail:  jmeyer@mcrlawyers.com
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of August, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Nichole S. Bogen
SATTLER& BOGEN LLP
The Creamery Building
701 P Street, Suite 301
Lincoln, NE 68508
nsb@sattlerbogen.com

_____/s/ Jennifer Meyer_____
Jennifer L. Turco Meyer

N:\WDOX\CLIENTS\20804\000\PLEA\00128697.DOC

-41-